1

2

3

4

5

6

7

8

9

10

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACY LUCAS, an individual, TAREK ALBABA, an individual, RIGOBERTO VINDIOLA, an individual, DAVID GAMMA, an individual, SARAH FISHER, an individual, on behalf of themselves and all other similarly situated consumers, | Case No. 15-cv-00258-BAS-NLS **ORDER:** **(1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND** |
| Plaintiffs, | **(2) DENYING DEFENDANT'S MOTION FOR CLASS CERTIFICATION** |
| v. | |
| BREG, INC., a California corporation; GARY LOSSE, an individual; MARK HOWARD, an individual; and DOES 1 through 50, inclusive, | **[ECF Nos. 55, 76]** |
| Defendants. | |

11

12

13

14

15

16

17

18

19

20

21

22

23    This case arises out of alleged misrepresentations and omissions made by

24  Defendant Breg in connection with the marketing and sale of its Polar Care 500 cold

25  therapy device ("PC 500"). Plaintiffs assert claims for violations of California's

26  consumer protection laws, common law fraud, and breach of warranty, and now

27  move to certify a nationwide class and California subclass of consumers who

28  purchased or rented the product. (ECF No. 55.) Defendants oppose and move for

1    summary judgment. (ECF NO. 76.) Both motions have been fully briefed.

2         The Court finds the motions suitable for disposition on the papers submitted

3    and without oral argument. *See* Civ. L.R. 7.1(d)(1). For the reasons that follow, the

4    Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary

5    judgment and DENIES Plaintiffs' motion for class certification.

6

7    **I.    BACKGROUND**

8         Defendant Breg is a California corporation that markets and sells a variety of

9    cold therapy devices throughout the United States.[1] Since 1992, Breg has marketed

10   its PC 500 as a prescription-only device particularly suited for orthopedic patients

11   recovering from surgery.[2] (Third Amended Complaint ("TAC") ¶ 23.) The PC 500 is

12   a portable, motorized device—similar in appearance to a small ice cooler—that

13   circulates ice cold water through a pad. Users set the device to a desired temperature

14   and place the pad on the site of their injury to reduce pain and swelling. (*Id*. ¶ 28,

15   29.)

16        Since placing the PC 500 on the market, Breg has included with the device a

17   "Use Instruction" that states: "Desired temperature is typically between 45 to 55

18   degrees Fahrenheit for continuous use and below 45 degrees Fahrenheit for sessions

19   of 20 minutes or less." (*Id*. ¶ 28.) Continuous use for purpose of the Use Instruction

20   is defined as 20 minutes or longer. Over time, Breg has supplemented the Use

21   Instruction with additional information and warnings, but the Use Instruction itself

22   has remained largely unchanged in both form and substance. (*Id*. ¶ 31; ECF No. 55

23   ("Mot. for Class Cert.") 4–5.)

24        Named Plaintiffs Stacey Lucas, Tarek Albaba, David Gamma, and Sarah

25

26   _____

27   [1] Defendants Gary Losse and Mark Howard are former directors of Breg who allegedly played a
     key role in developing the PC 500. (Third Amend. Compl. ¶ 22.)

28   [2] In 2012, Breg renamed the PC 500 the Polar Care Glacier.

                                        – 2 –

Fisher (collectively, "Plaintiffs")[3] are consumers who purchased or rented the PC 500 following surgery. (TAC 5–9.) Plaintiffs allege that Defendants misrepresented the benefits and concealed the risks associated with using the PC 500 from prescribing physicians and consumers alike. (*Id*. ¶ 3.) Specifically, Plaintiffs allege that using the PC 500 in accordance with the Use Instruction—that is, continuous use between 45 and 55 degrees Fahrenheit—poses a risk of serious bodily injury, including frostbite and permanent damage to skin and nerve tissue. (*Id*. ¶¶ 25, 31.) Plaintiffs allege that Defendants have known about these risks since introducing the device into commerce yet have refused to warn physicians and consumers.[4] None of the Plaintiffs suffered bodily injury in connection with their use of the PC 500, but they allege that they never would have purchased, rented, or used the device had they known about the risks associated with continuous use. (*Id*. ¶¶ 4, 36, 38.)

Based on Breg's alleged misrepresentations and omissions, Plaintiffs' Third Amended Complaint asserts claims for (1) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq*.; (2) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Bus. & Prof. Code §§ 1770 *et seq*.; (3) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*.; (4) common law fraud, and (5) breach of express and implied warranty. Among other relief, Plaintiffs seek rescission, restitution, actual and punitive damages, costs, and attorney's fees, as applicable. (TAC 51–52.)

Plaintiffs now seek to certify a nationwide class and California subclass of all consumers who, before purchasing or renting the PC 500, were exposed to a statement or instruction from Breg or a health care provider that the PC 500 was safe

---

[3] Plaintiff Rigoberto Vindiola was dismissed from this case on December 17, 2015. (ECF No. 52.)

[4] Plaintiffs allege that hundreds of personal injury actions have been filed against Breg, primarily in California state court, and that Breg is aware of more than 300 injuries resulting from use of the PC 500. (TAC ¶¶ 4, 26.)

and effective for continuous use, or who were not told there was a material risk of bodily injury if the device was used continuously.[5] (Mot. for Class Cert. ¶ 10.) The proposed classes specifically exclude any person who suffered bodily injury as a result of using the device. Defendants oppose, and move for summary judgment. (ECF No. 76 ("Mot. Summ. J.").)

## II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Court first considers Defendants' motion for summary judgment before turning to Plaintiffs' motion for class certification. *See Wright v. Schock*, 742 F.2d 541, 543–44 (9th Cir. 1984) ("[W]here it is more practicable to do so and where the parties will not suffer significant prejudice . . . the district court has discretion to rule on a motion for summary judgment before it decides the certification issue."). Defendants' move for summary judgment on the grounds that all of Plaintiffs' claims are time-barred. (Mot. Summ. J. 1.) In the alternative, Defendants seek partial summary judgment that (1) Plaintiffs lack standing to seek injunctive relief; (2) Plaintiffs cannot recover for breach of warranty; and (3) Plaintiffs are not entitled to restitution. (*Id.* 2.)

## A.   Legal Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court may grant summary judgment on each claim or defense, "or the part of each

---

[5] Plaintiffs' proposed class definitions are provided in full in Part III *infra*.

1    claim or defense," on which summary judgment is sought. Fed. R. Civ. P. 56(a).

2        The moving party has the initial burden of demonstrating the absence of a

3    genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A

4    movant satisfies the initial burden by either affirmatively negating the nonmoving

5    party's claim, or by demonstrating that the nonmoving party is unable to prove an

6    essential element of that claim." J. Friedenthal, M. Kane, & A. Miller, *Civil*

7    *Procedure* § 9.3, p. 457, n.81 (5th ed. 2015). To meet this burden, a party usually

8    cites to depositions, affidavits or declarations, interrogatory answers, or other

9    materials in the record. Fed. R. Civ. P. 56(c)(1)(A). If the moving party fails to carry

10   its initial burden, the nonmoving party has no obligation to produce evidence in

11   response, and summary judgment will be denied. *See Adickes v. S.H. Kress & Co.*,

12   398 U.S. 144, 160–61 (1970); *Great Haw. Fin. Corp. v. Aiu*, 863 F.2d 617, 619 (9th

13   Cir. 1988) (per curiam). However, if the moving party meets its initial burden, the

14   nonmoving party must then go beyond the pleadings and by its own evidence, or by

15   citing to appropriate materials in the record, show that there is a genuine factual

16   dispute for trial. *Celotex*, 477 U.S. at 324; *see also S.A. Empresa de Viacao Aerea*

17   *Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982)

18   ("[A] party cannot manufacture a genuine issue of material fact merely by making

19   assertions in its legal memoranda.") (citations omitted).

20       In deciding a motion for summary judgment, the court does not make

21   credibility determinations or weigh conflicting evidence, but instead views the

22   evidence and draws all reasonable inferences in favor of the party opposing the

23   motion. *See Anderson*, 477 U.S. at 255. At this stage of the litigation, the court's role

24   is simply to determine whether a genuine dispute exists for trial, not to resolve the

25   dispute itself. *See Tree of Life Christian Schools v. City of Upper Arlington*, 823 F.3d

26   365, 367 (6th Cir. 2016) ("Federal courts may not resolve genuine issues of material

27   fact on motions for summary judgment[.]"); *Albino v. Baca*, 747 F.3d 1162, 1173

28   (9th Cir. 2014). Thus, a party whose case appears weak on the merits can still survive

1    summary judgment so long as the evidence presented would allow a jury to
2    reasonably find in that party's favor. *See Anderson*, 477 U.S. at 254–55; *Am. Int'l*
3    *Grp., Inc. v. London Am. Int'l Corp. Ltd.*, 664 F.2d 348, 351 (2d Cir. 1981)
4    ("[S]ummary judgment is improper when the court merely believes that the opposing
5    party is unlikely to prevail on the merits after trial.").

7    **B.    Statute of Limitations and the Delayed Discovery Rule**

8        Defendants first argue that Plaintiffs' claims are time-barred. There is no
9    dispute that Plaintiffs' claims—which are governed by a three- or four-year statute
10   of limitations—are time-barred unless an exception to the general rule for accrual
11   applies.[6] Plaintiffs argue that their claims were timely filed under the delayed
12   discovery rule, while Defendants move for summary judgment on the grounds that
13   Plaintiffs have produced no evidence showing they are entitled to rely on the rule.[7]

14       "Generally speaking, a cause of action accrues at the time when the cause of
15   action is complete with all of its elements." *Fox v. Ethicon Endo-Surgery, Inc.*, 110
16   P.3d 914, 920 (Cal. 2005) (internal quotation marks and citation omitted). An
17   important exception to this general rule is the "discovery rule," which "postpones
18   accrual of a cause of action until the plaintiff discovers, or has reason to discover, the
19   cause of action." *Id.* "A plaintiff has reason to discover a cause of action when he or
20   she 'has reason at least to suspect a factual basis for its elements.'" *Id.* Thus, under
21   the discovery rule, "the statute of limitations begins to run when the plaintiff suspects

23   [6] The limitations period is three years for Plaintiffs' FAL, CLRA, and negligent and intentional
24   misrepresentation claims (Cal. Code Civ. Proc. §§ 338(a), (d); Cal. Civ. Code § 1783), and four
     years for Plaintiffs' UCL and breach of warranty claims (Cal. Bus. & Prof. Code § 17208; Cal.
25   Comm. Code § 2725). Plaintiff Lucas most recently used the PC 500 in 1995; Plaintiff Gamma in
     1998 or 1999; Plaintiff Fisher in 2004; and Plaintiff Albaba in 2005. (TAC ¶¶ 5–6, 8–9.) Plaintiff
26   Lucas filed the initial complaint in this matter on June 13, 2011 (ECF No. 1-3).

27   [7] Plaintiffs do not argue for delayed accrual of their breach of warranty claims under the discovery
28   rule, but instead seek to estop Defendants from asserting a limitations defense with respect to
     those claims. The Court addresses this argument in Part II.C. *infra*.

1    or should suspect that her injury was caused by wrongdoing." *Jolly v. Eli Lilly & Co.*,

2    751 P.2d 923, 927 (Cal. 1988) (en banc); *see also id*. at 928 ("Once the plaintiff has

3    a suspicion of wrongdoing, and therefore an incentive to sue, she must decide

4    whether to file suit or sit on her rights.").

5    Defendants argue that Plaintiffs cannot employ the discovery rule because they

6    failed to bring their suit within the respective limitations periods despite having

7    suspected wrongdoing on behalf of Defendants. (Mot. Summ. J. 13–16.) Defendants

8    point to Plaintiffs' various complaints about the PC 500's characteristics—e.g., that

9    the device was cumbersome to use—as demonstrating that Plaintiffs had reason to

10   suspect wrongdoing soon after they purchased or rented the device. Defendants argue

11   that Plaintiffs' suspicion triggered a duty to investigate their potential claims, and

12   that there is no evidence that Plaintiffs did so. On these grounds, Defendants argue

13   there is no basis for delaying accrual of any of Plaintiffs' claims, and therefore those

14   claims are time-barred as a matter of law.

15   The Court finds that Defendants have failed to demonstrate the absence of a

16   genuine factual dispute. Although Defendants are correct that a plaintiff who suspects

17   an injury has been wrongfully caused has a duty to investigate the potential causes of

18   that injury before employing the discovery rule, *Fox*, 110 P.3d at 920, Defendants

19   are wrong to conclude there is no dispute as to whether such a duty was triggered

20   here. Here, the gravamen of Plaintiffs' allegations is that Defendants misrepresented

21   the risks of bodily injury associated with continuous use of the PC 500 between 45

22   and 55 degrees Fahrenheit. (TAC ¶¶ 3, 38.) Thus, the suspicion needed to trigger a

23   duty to investigate is suspicion concerning the risks of bodily injury associated with

24   using the PC 500. Only at the point Plaintiffs were on notice of that risk would they

25   have reason to investigate the possibility that they overpaid for a device that was not

26   safe under its own Use Instructions. *See In re Coordinated Pretrial Proceedings in*

27   *Petroleum Prods. Antitrust Litig.*, 782 F. Supp. 487, 498 (C.D. Cal. 1991) ("Plaintiffs

28   are not under a duty continually to scout around to uncover claims which they have

no reason to suspect they might have."); *Nelson v. Indevus Pharma., Inc.*, 48 Cal. Rptr. 3d 668, 671 (Cal. App. 2006) ("[I]t is clear that a plaintiff's duty to investigate does not begin until the plaintiff actually has a reason to investigate.").

The evidence proffered by Defendants, however, concerns Plaintiffs' testimony that the PC 500 was cumbersome to use; that it was not necessarily more effective than ice; and that the device's temperature gauge was inaccurate. (Mot. Summ. J. 14–15.) None of these acknowledgements by Plaintiffs compel the conclusion that Plaintiffs should have reasonably suspected the device could cause serious bodily injury. In light of Plaintiffs' declarations and testimony that they did not discover that the PC 500 posed a risk of injury before meeting with counsel shortly before filing or joining the lawsuit, the Court finds there is a genuine dispute of fact as to whether Plaintiffs had reason to suspect an injury prior to being notified by counsel. *See O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1157 (9th Cir. 2002) ("At summary judgment, Plaintiffs [seeking to invoke the discovery rule] have a duty to explain, and support by way of evidence, how they discovered their claims."). Thus, the Court cannot conclude on the evidence that Plaintiffs cannot employ the discovery rule and that their claims are time-barred as a matter of law. *See Jolly*, 751 P.2d at 928–29 (explaining that summary judgment on statute of limitations issues is proper only "where uncontradicted facts established through discovery are susceptible to only one legitimate inference"). Accordingly, Defendants' motion for summary judgment on this issue is denied.[8]

---

[8] Defendants' reliance on this Court's decision in *Allen v Similasan Corp.*, 96 F. Supp. 3d 1063 (S.D. Cal. 2015), actually undermines their argument that the discovery rule does not apply here. In *Allen*, the Court found that one of the plaintiffs should have suspected the basis for her claim regarding the ineffectiveness of an allergy relief product given that she testified she knew her allergy symptoms were not clearing up after taking the product. The instant case is distinguishable. Here, Plaintiffs' testimony about their experience with the PC 500 does not suggest Plaintiffs had reason to suspect the basis of their claims regarding Defendants' misrepresentation of the risks associated with using the device.

**C.      Breach of Warranty Claims**

Defendants move for summary judgment on Plaintiffs' breach of warranty claims on the grounds that those claims are time-barred under the California Commercial Code and relevant case law. (Mot. Summ. J. 13:3–8.) Plaintiffs do not dispute that their breach of warranty claims fall outside the four-year statute of limitations provided by the California Commercial Code, but argue that there is a genuine dispute of fact as to whether Defendants should be estopped from asserting statute of limitations defense.

The Court first confirms what both sides appear to agree—the delayed discovery rule is not applicable to Plaintiffs' breach of warranty claims. Under California Commercial Code § 2725, a claim for breach of warranty must be commenced within four years after the claim has accrued, and such claims accrue "when tender of delivery is made." Cal. Comm. Code § 2725(2). The only statutory exception to the four-year statute of limitations is "where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance." *Id*. Where this "future performance" exception applies, the breach of warranty claim "accrues when the breach is or should have been discovered." *Id*.

The Court agrees with Defendants that the future performance exception does not apply here. In interpreting the scope of the future performance exception, California courts have adopted the majority view that the exception "applies only when the seller has expressly agreed to warrant its product *for a specific and defined period of time*." *Cardinal Health 301, Inc. v. Tyco Elec. Corp.*, 87 Cal. Rptr. 3d 5, 16 (Ct. App. 2008); *see also Carrau v. Marvin Lumber & Cedar Co.*, 112 Cal. Rptr. 2d 869, 875 (Ct. App. 2001). That is not the case here. Here, the Use Instruction at issue refers to a set of conditions—45 to 55 degrees Fahrenheit for continuous use—under which consumers may use the device. The instruction does not "refer explicitly to a specific temporal period[]," such that the future performance exception applies. *W.*

1    *Recreational Vehicles, Inc. v. Swift Adhesives, Inc.*, 23 F.3d 1547, 1550 (9th Cir.
2    1994). Thus, Plaintiffs' claims for breach of express and implied warranty, which
3    they bring more than four years after the date they purchased or rented the device,
4    are barred by § 2725.

5          Plaintiffs do not dispute that their breach of warranty claims are barred under
6    § 2725, but argue there is a genuine dispute as to whether equitable estoppel should
7    bar Defendants from pleading a statute of limitations defense. Plaintiffs point to their
8    declarations—in which they attest they did not discover Defendants'
9    misrepresentations and omissions regarding the risks until recently—as evidence
10   demonstrating that equitable estoppel should apply.

11         "Under appropriate circumstances[,] equitable estoppel will lie to bar a
12   defendant from pleading the bar of the statute of limitations where the plaintiff was
13   induced to refrain from bringing a timely action by the fraud, misrepresentation or
14   deceptions of defendant." *Kleinecke v. Montecito Water Dist.*, 195 Cal. Rptr. 58, 61
15   (Cal. App. 1983) (citations omitted); *see also Mills v. Forestex Co.*, 134 Cal. Rptr.
16   2d 273, 295 (Cal. App. 2003) ("A defendant will be estopped to assert the statute of
17   limitations if defendant's conduct, relied on by the plaintiff, has induced plaintiff to
18   postpone filing the action until after the statute has run."). The purpose of the doctrine
19   is to ensure that a defendant who "lull[s] his adversary into a false sense of security"
20   is not then able to plead a statute of limitations defense based on "the delay
21   occasioned by his own conduct." *Id*. The elements of equitable estoppel are (1) the
22   party to be estopped must know the facts; (2) he must intend that his conduct shall
23   be acted upon, or must so act that the party asserting the estoppel has the right to
24   believe it was so intended; (3) the other party must be ignorant of the true state of
25   facts; and (4) the other party must rely on the conduct to his injury. *Schafer v. City of
26   Los Angeles*, 188 Cal. Rptr. 3d 655, 664–65 (Cal. App. 2015).

27         The Court finds there is no genuine dispute as to whether Defendants induced
28   Plaintiffs to refrain from bringing their breach of warranty claims. The only conduct

Plaintiffs point to as suggesting Defendants induced them to postpone bringing a timely suit is Defendants' alleged misrepresentations and omissions regarding risks of the PC 500. (Pls.' Opp'n 8:8–9:4.) However, these misrepresentations and omissions are the cause of the injury giving rise to the suit itself, not separate deceptive conduct intended to induce Plaintiffs to sit on their claims. *See, e.g.*, *Whitney Holdings v. Givotovsky*, 988 F. Supp. 732 (S.D.N.Y. 1997) (holding that equitable estoppel was not appropriate where the grounds for invoking equitable estoppel were not separate and apart from the grounds for the substantive claim). Plaintiffs provide no facts to suggest that Defendants' misrepresentations and omissions were intended to prevent Plaintiffs from bringing their claims, rather than to convince consumers to purchase or rent the product. Instead, Plaintiffs cite their declarations in which they state that they never would have purchased, rented, or used the PC 500 had they known about the risks. This does not raise a genuine factual dispute as to whether Defendants induced Plaintiffs to postpone bringing their claims. Thus, the Court finds that Plaintiffs cannot invoke equitable estoppel, and that their breach of warranty claims are time-barred as a matter of law. Accordingly, the Court GRANTS Defendants' motion for summary judgment on Plaintiffs' breach of warranty claims.

**D.     Article III Standing**

Plaintiffs seek injunctive relief under the FAL, CLRA, and UCL to enjoin Defendants from engaging in the alleged misrepresentations and omissions regarding the PC 500. (Mot. for Class Cert. 34:16–18.) Defendants contend they are entitled to summary judgment that Plaintiffs lack Article III standing to seek such relief. The Court agrees.

Article III of the Constitution restricts the jurisdiction of federal courts to actual "cases" and "controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. —, 133 S. Ct. 1138, 1146 (2013). An essential element of this case-or-controversy

requirement is that plaintiffs must establish they have "standing" to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The standing requirement ensures that federal courts exercise their power consistent with the separation-of-powers principles that animate the constitutional structure. *Clapper*, 568 U.S. —, 133 S. Ct. at 1146 ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches.").

To establish Article III standing, a plaintiff must show: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) that the injury is fairly traceable to the defendant's challenged conduct; and (3) that the injury is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61. Where a plaintiff seeks prospective injunctive relief, Article III requires a plaintiff to show "a sufficient likelihood that he will again be wronged again in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). In other words, a plaintiff must establish a "real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). "Allegations of *possible* future injury do not satisfy the requirements of Article III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added).

In this case, Defendants argue there is no genuine dispute that Plaintiffs will not again purchase or rent the PC 500, and therefore Plaintiffs cannot establish the real and immediate threat of repeated injury needed to establish standing for injunctive relief. Defendants point to Plaintiffs' declarations in which they attest "If I had known the PC 500 could not be safely used continuously . . . I would, obviously, never have agreed to use the device, no matter who paid for it." (Lucas Decl. ¶ 9; Albaba Decl. ¶ 10; Fisher Decl. ¶ 11; Gamma Decl. ¶ 9.) In Defendants' view, these statements demonstrate that Plaintiffs have no intent of purchasing or renting the device in the future, and thus face no prospect of future injury. (Mot. Summ. J. 17:2–9.)

The Court agrees with Defendants. The evidence presented does not raise a

genuine dispute as to whether Plaintiffs intend to purchase or rent the PC 500 in the future. Plaintiffs have already paid an inflated price based on the alleged misrepresentations, and have discontinued using the PC 500. Plaintiffs cite no evidence suggesting a likelihood that they will be wronged again in a similar way, and do not dispute that they do not intend to purchase or rent the PC 500 in the future. Under these circumstances, the Court concludes that there is no genuine dispute that Plaintiffs will not purchase or rent the PC 500 again. As a result, Plaintiffs have not established the "real and immediate threat of repeated injury" needed to establish standing for prospective injunctive relief. *O'Shea*, 414 U.S. at 496.

Rather than assert a likelihood of future injury, Plaintiffs point to a line of cases that have allowed plaintiffs to sue for injunctive relief under California's consumer protection laws even where plaintiffs have not pled any intent to make another purchase of the product giving rise to the suit. (Pls.' Opp'n 9–12.) Citing policy grounds, these cases have concluded that Article III standing should be construed in a way that best facilitates enforcement of California's consumer protection statutes.

The decision in *Henderson v. Gruma Corp.*, No. CV 10–04173 AHM (AJWx), 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011), on which Plaintiffs principally rely, is illustrative. There the court rejected the defendant's argument that plaintiffs lacked Article III standing to seek injunctive relief under the UCL and FAL where they could not establish a threat of future injury. Although the plaintiffs at the time of the suit were aware of the alleged deceptive advertising, and alleged they would not purchase the products at issue in the future, the *Henderson* court concluded that this did not preclude the plaintiffs from seeking injunctive relief on behalf of a class. The court found that defendant's "narrow[]" interpretation of Article III standing for FAL and UCL claims would "thwart the objective of California's consumer protection laws" because "a plaintiff who had been injured would always be deemed to avoid the cause of the injury thereafter . . . and would never have Article III standing." *Henderson*, 2011 WL 1362188, at *7–8. Plaintiffs urge this Court to adopt the more flexible

1    reading of Article III standing reflected in *Henderson* and related cases.

2         Although Plaintiffs' reliance on the *Henderson* line of cases is well taken, the

3    Court disagrees that the policy concerns raised in those cases, and by Plaintiffs here,

4    justify a looser reading of Article III standing requirements. Injury in fact is part of

5    the "*irreducible* constitutional minimum" of standing, *Lujan*, 504 U.S. at 560

6    (emphasis added), and where a plaintiff seeks injunctive relief, injury in fact requires

7    a real and immediate threat of future injury. Although this requirement may limit the

8    role of federal courts in adjudicating claims for injunctive relief under California's

9    consumer protection laws, this is a limitation dictated by the Federal Constitution and

10   envisioned by our federal system. As important as consumer protection may be as a

11   policy matter, the Court cannot lower the threshold for Article III standing based on

12   the imperatives of California's legislature. *See, e.g.*, *Delarosa v. Boiron, Inc.*, 2012

13   WL 8716658, at *5 (C.D. Cal. Dec. 28, 2012) ("To the extent that *Henderson* and

14   other cases purport to create a public-policy exception to the standing requirement,

15   that exception does not square with Article III's mandate."). It is the Constitution and

16   Congress that determines the jurisdiction of the federal courts, not the legislatures of

17   the various states. *Fielder v. Clark*, 714 F.2d 77, 80 (9th Cir. 1983) ("However

18   extensive their power to create and define substantive rights, the states have no power

19   directly to enlarge or contract federal jurisdiction."). Plaintiffs' emphasis on policy

20   implications does not change their failure to create a genuine factual dispute as to

21   their lack of threat of future injury.

22        In sum, Plaintiffs have not shown a genuine dispute on their lack of threat of

23   future injury. Because there is no threat of future injury, Plaintiffs do not have

24   standing to pursue injunctive relief, and that relief is also unavailable to the class. *See*

25   *O'Shea*, 414 U.S. at 494 ("[I]f none of the named plaintiffs purporting to represent a

26   class establishes the requisite of a case or controversy with the defendants, none may

27   seek relief on behalf of himself or any other member of the class.") (citations

28   omitted). Accordingly, Defendants' motion for summary judgment on this ground is

1    GRANTED.

2

3    **E.    Entitlement to Restitution**

4          Finally, Defendants argue that Plaintiffs are not entitled to restitution as a

5    matter of law because there is no genuine dispute that Plaintiffs suffered no out-of-

6    pocket loss. Defendants contend that the evidence demonstrates either (1) that

7    Plaintiffs cannot recall if they paid out-of-pocket for the PC 500 or (2) that Plaintiffs'

8    insurance paid for the purchase or rental of the device. In opposition, Plaintiffs argue

9    that the evidence as to Plaintiffs Albaba and Fisher do raise a genuine dispute as to

10   whether they paid out-of-pocket for the PC 500. More fundamentally, Plaintiffs argue

11   that it is irrelevant whether they suffered an out-of-pocket monetary loss because they

12   are nonetheless entitled to restitution of the money paid by their insurance companies

13   on their behalf. (Pls.' Opp'n 13–19.)

14         The Court first addresses Plaintiffs' novel theory of restitution. Restitution is

15   available for claims brought under the UCL, FAL, and CLRA, as well as for fraud

16   claims. *See Colgan v. Leatherman Tool Grp., Inc.*, 38 Cal. Rptr. 3d 36, 58 (Cal. App.

17   2006); *Alliance Mortg. Co. v. Rothwell*, 900 P.2d 601, 609 (Cal. 1995). The purpose

18   of restitution is to restore the status quo by returning to the plaintiff funds in which

19   he or she has an ownership or vested interest. *See Korea Supply Co. v. Lockheed*

20   *Martin Corp.*, 63 P.3d 937, 947–48 (Cal. 2003); *see also Cortez v. Purolator Air*

21   *Filtration Prods. Co.*, 999 P.2d 706, 715 (Cal. 2000) (explaining that a restitutionary

22   award represents "money that once had been in the possession of the person to whom

23   it [is] to be restored"). A plaintiff has an ownership interest in money or property

24   when the money was once in plaintiff's possession and a defendant has taken it

25   directly from plaintiff. *See Korea Supply Co.*, 63 P.3d at 947. A plaintiff has a vested

26   interest in money or property when the money or property is "due and payable" to

27   the plaintiff, but has yet to be paid. *Id.*; *Cortez*, 999 P.2d at 715–16. Where a plaintiff

28   has neither an ownership nor vested interest in the money he or she seeks to recover,

1   the plaintiff is not entitled to restitution. *See Madrid v. Perot Sys. Corp.*, 30 Cal. Rptr.
2   3d 210, 219–20 (Cal. App. 2005).

3       Plaintiffs urge this Court to adopt a more expansive view of restitution that
4   would allow them to sue for the return of monies paid by their insurers on their behalf.
5   Plaintiffs contend that even if they personally paid no money to buy or rent the PC
6   500, they nonetheless suffered an economic loss when their insurance benefits were
7   expended on a product that was much riskier and less effective than advertised.
8   Pointing to *Cortez*, 999 P.2d 706, 715 (Cal. 2000), Plaintiffs explain that courts do
9   not focus narrowly on whether the plaintiff actually possessed the money for which
10  he or she seeks restoration, but whether he or she had a right or interest in the money.
11  (Pls.' Opp'n 18:21–24.) The Court finds Plaintiffs' theory of restitution unavailing
12  for at least two reasons.

13      First, Plaintiffs overread *Cortez*. In *Cortez*, the California Supreme Court
14  considered whether an employee could recover unlawfully withheld wages as
15  restitution in a UCL action. In deciding that issue in the affirmative, the Court
16  recognized that although the plaintiff employee had never actually possessed the
17  wages for which she sought restitution, she had nonetheless already earned the wages,
18  and so had a vested interest. *Cortez*, 999 P.2d at 715–16. The lesson of *Cortez*, then,
19  is that the concept of restitution includes not only money or property that was once
20  in possession of the plaintiff, but also money or property in which the plaintiff has a
21  vested interest. Thus, Plaintiffs' reliance on *Cortez* only begs the question whether
22  they have an ownership or vested interest in the insurance benefits paid on their
23  behalf.

24      Plaintiffs concede they have no ownership interest in the insurance benefits
25  paid on their behalf—those benefits were never in Plaintiffs' possession, and
26  Defendants did not take those benefits directly from Plaintiffs. *Korea Supply Co.*, 63
27  P.3d at 947. However, Plaintiffs suggest that their interest in their insurance benefits
28  is vested in a way contemplated by *Cortez*. This is incorrect. The only right that

Plaintiffs have in their insurance benefits is a right to have monies paid on their behalf to a third party. This right is "vested" in the sense that Plaintiffs have paid insurance premiums to guarantee the payment of benefits in accordance with their insurance policies. But that is as far as the interest goes. Plaintiffs' insurance premiums did not guarantee them a future possessory interest in monies paid on their behalf to third parties in the way the *Cortez* plaintiff's past labor guaranteed her a future ownership interest in her unpaid wages. *Cortez*, 999 P.2d at 715–16. A restitution order by this Court that awarded Plaintiffs the amount their insurance companies paid on their behalf, rather than the amount that Plaintiffs paid out-of-pocket, would not restore Plaintiffs' position but rather confer a windfall on Plaintiffs. The restitution remedy does not extend this far.[9] *Madrid*, 30 Cal. Rptr. 3d at 221 ("[R]estitution means the return of money to those persons from whom it was taken or who had an ownership interest in it.").

\*   \*   \*

Having determined that Plaintiffs' restitution interest does not include an interest in money paid by insurance companies on Plaintiffs' behalf, the Court now

---

[9] Plaintiffs also rely heavily on *Helfend v. S. Cal. Rapid Transit Dist.*, 465 P.2d 61 (Cal. 1970), to argue that they are entitled to restitution of insurance monies paid to Breg on their behalf. In *Helfend*, the California Supreme Court reaffirmed the collateral source rule, explaining that "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." *Id.* at 63. The court went on to note that a defendant who injures another "should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." *Id.* at 66–67.

The Court finds that *Helfend* in particular, and the collateral-source rule line of cases in general, is inapposite to the instant case. Here, Defendants are not arguing that the damages Plaintiffs seek for their injuries should be offset by the amount that Plaintiffs' insurance companies have paid to meet the costs of those injuries. Instead, Defendants argue that Plaintiffs should not be able to use insurance monies paid on their behalf as a standalone source of economic loss—i.e., injury—on which to base restitution. The Court agrees. The point of *Helfend* is to ensure that a tortfeasor who injures another cannot use insurance payments paid on the injured party's behalf to mitigate the damages the tortfeasor otherwise owes. The Court finds nothing in *Helfend* to support the much more expansive proposition that a plaintiff can use insurance monies paid to purchase or rent a product on the plaintiff's behalf as a source of injury on which to seek restitution.

considers whether there is a genuine dispute of fact as to whether Plaintiffs paid out-of-pocket for the PC 500. The Court finds that only in the case of Plaintiff Albaba is there a genuine dispute on this issue.

At their depositions, Plaintiffs Lucas and Gamma testified that they did not pay out-of-pocket for the PC 500. Plaintiff Lucas testified that "if insurance wouldn't have covered it, I wouldn't have purchased—I wouldn't buy that." (Lucas Dep. 77:11–13.) For his part, when asked whether he paid any amount out-of-pocket for the PC 500, Gamma responded "No . . . Other than insurance premiums or whatever . . . But no." (Gamma Dep. 63:16–23.) This testimony is sufficient to establish an absence of genuine dispute as to whether Lucas and Gamma paid out-of-pocket, and Plaintiffs in opposition fail to produce or point to any evidence that might create a triable issue of fact. Thus, the Court concludes as a matter of law that Plaintiffs Lucas and Gamma are not entitled to restitution.

Defendants also show that Plaintiff Fisher cannot produce evidence to support the fact that she paid money out-of-pocket for the PC 500. (Fisher Dep. 199.) Fisher points to other portions of her deposition testimony in an attempt to raise a genuine factual dispute, but this testimony only highlights the lack of evidence. In the testimony on which Fisher relies, counsel for Defendants asks whether or not Fisher recalls if insurance paid for the rental of her PC 500, to which Fisher twice replies "I do not recall." (Fisher Dep. 87:7–15.) Such "failures of recollection" on a material fact are insufficient to survive summary judgment once discovery is complete. *Fed. Election Comm'n v. Toledano*, 317 F.3d 939, 949–50 (9th Cir. 2002); *see also Stein v. United States*, No. 07 Civ. 2684(LMM), 2009 WL 195953, at *6 (S.D.N.Y. Jan. 28, 2009) (explaining that a non-movant's failure to recall details on a material fact is insufficient to withstand summary judgment) (citation omitted). Thus, there is no genuine dispute that Fisher did not pay out-of-pocket for the PC 500 she used, and the Court concludes as a matter of law that Fisher is not entitled to restitution.

Plaintiff Albaba's situation is different from the other named plaintiffs.

Defendants contend that summary judgment is appropriate based on Albaba's testimony that he cannot recall the exact amount that his insurance companies paid toward his PC 500. (Albaba Dep. 60:1–9.) But this portion of Albaba's testimony concerns only the scope of his insurance companies' coverage; it does not, when viewed in light of Albaba's other testimony, demonstrate the absence of a genuine dispute of fact over whether Albaba himself paid anything out-of-pocket. In fact, as Plaintiffs point out, Albaba also testifies that although his insurance companies "paid for some of it," he "was still left with a hefty out-of-pocket tab, which I had to get a loan to pay off[.]" (Albaba Dep. 57:1–9.) Albaba later expounded on his need to pay out-of-pocket, testifying that "I was left with these outstanding balances as a 21-year old who's trying to finish school, and I had to get a loan against my car to pay for everything. I believe it was $7,000 when it was all said and done. So eventually I paid for everything." (Albaba Dep. 58:11–22.) This testimony is sufficient to create a genuine dispute of material fact. Viewing the evidence in the light most favorable to Plaintiffs, a rational jury could find that Albaba paid some portion of the purchase or rental price of the PC 500 out-of-pocket. Thus, the Court cannot conclude as a matter of law that Albaba is not entitled to restitution. Summary judgment on the restitution question as to Albaba is therefore improper.

* * *

In sum, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment. Summary judgment is granted on (1) Plaintiffs' breach of warranty claims, (2) the issue of Plaintiffs' standing to seek injunctive relief, and (3) the issue of Plaintiff Lucas, Fisher, and Gamma's entitlement to restitution. Summary judgment is DENIED on (1) the question whether Plaintiffs' UCL, CLRA, FAL, and fraud claims are time-barred, and (2) whether Plaintiff Albaba is entitled to restitution.

### III.   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The Court turns now to Plaintiffs' motion for class certification. Plaintiffs seek to certify a nationwide class of consumers and a subclass of California consumers. Both proposed classes specifically exclude individuals who suffered bodily injury as a result of using the PC 500. (TAC ¶ 10.) The nationwide class is defined as:

> All consumers in the United States, who at any time during the period 1992 through the present, purchased and/or rented a Breg Polar Care 500 or Polar Care Glacier for personal use and not for resale, pursuant to a licensed physician's prescription, and who, prior to purchasing and/or renting said device, were exposed to a statement and/or instruction from Breg, or a health care provider, that the Polar Care 500 or Polar Care Glacier was safe and effective for continuous use, or were not told there was a material risk of bodily injury if said device was used continuously (for more than 20 minutes).

The California subclass is defined as:

> All consumers in California, who at any time during the period 1992 through the present, purchased and/or rented a Breg Polar Care 500 or Polar Care Glacier in California for personal use and not for resale, pursuant to a licensed physician's prescription, and who, prior to purchasing and/or renting said device, were exposed to a statement and/or instruction from Breg, or a health care provider, that the Polar Care 500 or Polar Care Glacier was safe and effective for continuous use, or were not told there was a material risk of bodily injury if said device was used continuously (for more than 20 minutes).

### A.   Legal Standard for Class Certification

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To justify a departure from this rule, a party seeking to maintain a class action must satisfy the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b). Here, Plaintiffs move to certify their proposed classes under Rule 23(b)(3)—which requires

common questions of law or fact to "predominate" over individual questions—and Rule 23(b)(2)—which is satisfied when injunctive relief is applicable to the class as a whole.

"Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. The party moving for class certification must make an affirmative showing that the Rule 23(a) requirements are satisfied, and demonstrate "through evidentiary proof" that the class satisfies at least one of the provisions of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. —, 133 S. Ct. 1426, 1432 (2013). The district court must conduct a "rigorous analysis" to determine whether these requirements are met. *Dukes*, 564 U.S. at 350–51 (citation omitted). Such analysis may include consideration of the merits of the underlying claim, but only to the extent the merits are relevant to determining whether the Rule 23 certification requirements are satisfied. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, — U.S. —, 133 S. Ct. 1184, 1194–95 (2013) (citing *Dukes*, 564 U.S. at 351, n.6). Within this analytical framework, the district court has "broad discretion" in deciding whether to certify a class. *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

### B.   Certification under Rule 23(b)(3) – The Predominance Requirement

To certify a class action under Rule 23(b)(3), the court must find that "questions of law and fact common to class members predominate over any questions affecting only individual members."[10] The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In assessing predominance, the court characterizes the issues in a case as common or individual,

---

[10] Rule 23(b)(3) also contains a "superiority" requirement under which the Court must find "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Because the Court finds that Plaintiffs have not satisfied the predominance requirement, the Court does not reach the issue of superiority.

and then carefully scrutinizes the relationship between them. *See Tyson Foods, Inc. v. Bouaphakeo*, — U.S. —, 136 S. Ct. 1036, 1045 (2016).

For purposes of the predominance requirement, a common issue is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof," while an individual issue is one where "the members of a proposed class will need to present evidence that varies from member to member." W. Rubenstein, *Newberg on Class Actions* § 4.50 (5th ed. 2012). Where common issues are the central feature of the litigation, predominance is likely satisfied. However, common questions will not predominate where the critical legal and factual issues in the case require individualized analysis.

The Court finds that Plaintiffs fail to meet the predominance requirement. As explained below, key issues concerning putative class members' exposure to the alleged misrepresentations or omissions; their reliance on the alleged misrepresentations or omissions; the fact of damages; and the statute of limitations all require individualized inquiries for resolution.

### 1. Reliance on Breg's Misrepresentations

Plaintiffs' UCL, FAL, CLRA, and fraud claims for restitution and damages all require a showing of reliance, of varying specificity, on the alleged misrepresentations or omissions. *See In re Tobacco II Cases*, 207 P.3d 20, 38–40 (Cal. 2009); *Chapman v. Skype Inc.*, 162 Cal. Rptr. 3d 864, 873–76 (Cal. App. 2013); *Davis-Miller v. Automobile Club of Southern California*, 134 Cal. Rptr. 3d 551, 564–65 (Cal. App. 2011); *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 95–98 (Cal. App. 2009). A showing of individualized reliance is not required under the UCL and FAL, but there must be a showing "that members of the public are likely to be deceived." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (quoting *In re Tobacco*, 207 P.3d at 29). A presumption of reliance arises where the misrepresentation at issue is "material"—that is, where a reasonable person would

attach importance to it in determining his choice of action in the transaction in question. *In re Tobacco*, 207 P.3d at 39. Under California law, reliance may be inferred on a class-wide basis "when the same material misrepresentations have been actually communicated to each member of a class." *Knapp v. AT & T Wireless Servs., Inc.*, 124 Cal. Rptr. 3d 565, 576 (Cal. App. 2011); *see also Mirkin v. Wasserman*, 858 P.2d 568, 575 (Cal. 1993). "[I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *In re Vioxx*, 103 Cal. Rptr. 3d at 93.

Here, the Court finds that issues of materiality and reliance with respect to the class are not subject to generalized proof, but rather require individualized inquiries. First, the Court cannot use generalized proof to determine whether putative class members were likely to be deceived, or otherwise relied on the alleged misrepresentations or omissions, because each class member purchased or rented the PC 500 in the context of a host of individualized factors. These include (1) the advice that each class member received from his or her prescribing physician; (2) how that advice was communicated to each class member; (3) whether each class member considered such advice and, if so, how it factored into the decision to purchase or rent the PC 500; and (4) how each class member assessed the risks. (Wood Decl. 6–17.) The Court cannot assess whether a reasonable consumer would attach importance to the misrepresentations or omissions regarding the risks associated with the PC 500 because each patient's decision-making calculus was dependent upon a variety of information and circumstances specific to the individual. Although a presumption of reliance may hold in the prototypical consumer protection case where a consumer buys a product against the backdrop of a uniform, broad-based advertising campaign, in this case the common question of reliance inevitably breaks down into individualized inquiries. *See, e.g.*, *Mazza v. Am. Honda Motor Co., Inc.*¸ 666 F.3d 581, 596 (9th Cir. 2012) ("A presumption of reliance does not arise

1   when class members 'were exposed to quite disparate information from various

2   representatives of the defendant.'") (citation omitted). Such individualized inquiries

3   weigh against a finding of predominance.

4

5       **2.  Fact of Damages**

6       When considering damages under the predominance inquiry, "[t]he amount of

7   damages is invariably an individual question and does not defeat class action

8   treatment." *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975); *see also Yokoyama*

9   *v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("[D]amages

10  calculations alone cannot defeat [class] certification."). However, there is a

11  distinction between the "fact of damages," which is essentially a threshold question

12  of causation and injury in fact, and the "amount of damages," which involves an

13  assessment of damages due after resolution of common questions of liability. *See*

14  *Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1350 (9th Cir. 1986) ("[T]he requirement

15  that plaintiff prove 'both the fact of damage and the amount of damage . . . are two

16  separate proofs.'") (internal citation omitted); *In re Live Concert Antitrust Litig.*, 247

17  F.R.D. 98 (C.D. Cal. 2007) (recognizing the distinction between fact of damages and

18  amount of damages in class certification analysis). This distinction is critical because

19  "[w]hile determining the *amount* of damages does not defeat the predominance

20  inquiry, a proposed class action requiring the court to determine individualized *fact*

21  of damages does not meet the predominance standards of Rule 23(b)(3)." *Gonzales*

22  *v. Comcast Corp.*, 2012 WL 10621 (E.D. Cal. Jan. 3, 2012); *see also In re Live*

23  *Concert Antitrust Litig.*, 247 F.R.D. at 135 ("[I]f individual issues concerning fact of

24  damages predominate, class certification is precluded.").

25      In this case, the fact of damages cannot be established for every class member

26  through proof common to the class. As the Court determined above, Plaintiffs are

27  only entitled to restitution to the extent they paid out-of-pocket for the PC 500;

28  insurance payments paid on their behalf do not constitute economic loss subject to

restitution under the facts of this case. Only Plaintiff Albaba survived summary judgment on this issue because the Court found that a reasonable jury could conclude that he paid out-of-pocket for the PC 500. The implication for class certification is that entitlement to restitution cannot be resolved by generalized proof. Instead, the Court would need to inquire whether each class member paid out-of-pocket or whether the insurance company paid on the individual's behalf. Such an inquiry would involve review of each class member's medical, billing, and insurance records to determine whether each suffered an out-of-pocket loss. This would not be a calculation of the amount of damages due, but rather a determination of whether the putative class members were harmed in the first instance. Given the temporal and geographic scope of the putative class, these determinations would easily predominate over common issues regarding Defendants' misrepresentations and omissions of risk. *See Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62 (S.D.N.Y. 2013) (concluding that plaintiff could not satisfy the predominance requirement where plaintiff could not prove through common evidence that members of the proposed class were entitled to recover damages); *Gonzales*, 2012 WL 10621 at *19 (finding that plaintiffs could not satisfy the predominance inquiry where "[t]he evidence indicates a myriad of individual inquiries are required to ascertain the fact of damages for each Class member").

### 3.  Statute of Limitations

For purposes of class certification, "[t]he existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones." *Williams v. Sinclair*, 529 F.2d 1383, 1388 (9th Cir. 1975). In particular, lower courts have found that predominance is not defeated where the doctrines used by plaintiffs for tolling a statute of limitations involve proof common to the defendants. *See Tait v. BSH Home Appliance Corp.*, 289 F.R.D. 466, 485–86 (C.D. Cal. 2012). However, where a statute of limitations defense "raises substantial individual

questions that vary among class members," such questions may defeat predominance. *See O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000). This is such a case.

Plaintiffs acknowledge that many of the claims (indeed, all of the claims of the named Plaintiffs) are time-barred unless they can employ the discovery rule or fraudulent concealment doctrine. On the facts of this case, the Court finds that resolving these statutes of limitation issues will involve individualized, fact-intensive inquiries.

Under both the discovery rule and the doctrine of fraudulent concealment, the relevant inquiry is whether the plaintiff was on notice—either notice of some wrongdoing in the case of the discovery rule, or notice of the specific cause of action in the case of fraudulent concealment. *See Migliori v. Boeing North American, Inc.*, 114 F. Supp. 2d 976, 983–84 (C.D. Cal. 2000). These determinations are not susceptible to generalized proof. Over the 24-year class period, Defendant Breg has periodically changed the form and content of its instructions and warnings such that putative class members, depending upon when they used the product, may have been on reasonable notice that they had a claim. For example, in 2007 Breg revised its operating instructions to require patients to use an insulation barrier between the skin and the PC 500 pad, and began instructing physicians to instruct patients to conduct skin checks. (Lebrun Decl. ¶ 6.5.) Since 2012, Breg's operating instructions have contained a prominently placed warning that states "Breg's Polar Care Cold Therapy can be cold enough to seriously injure skin." (*Id.* ¶¶ 6.6, 6.10). There have been other changes and revisions to this supplemental information. (*Id.* ¶¶ 6.6(6) Exs. 2, 11.) Although it is true the Use Instruction at the heart of this case has remained relatively unchanged, the revisions and warnings accompanying the Use Instruction are substantial enough to raise questions about whether these updates placed putative class members on notice of a potential claim. Depending upon when they used the product, different class members had access to different warnings and instructions

1    with the potential to color their interpretation of the alleged misrepresentations and

2    omissions regarding continuous use of the PC 500. Figuring out what set of warnings

3    and instructions class members were exposed to; when such exposure occurred;

4    whether in each case these warnings should have given class members reason to

5    suspect wrongdoing or a claim; and whether a reasonable investigation at that time

6    would have revealed a factual basis for the claim would require fact-intensive,

7    individualized inquiries. The Court finds that these inquires would easily overwhelm

8    common issues regarding Breg's alleged misrepresentations. *See Broussard v.*

9    *Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998).

10          In sum, the Court concludes that the issues subject to individualized proof

11   outweigh the issues subject to common proof. Thus, Plaintiffs have not satisfied the

12   predominance requirement and cannot certify a class action under Rule 23(b)(3).

13

14   **C.    Certification of Injunctive Relief Class under Rule 23(b)(2)**

15          Plaintiffs also seek to certify classes under Rule 23(b)(2). Rule 23(b)(2) allows

16   class treatment when "the party opposing the class has acted or refused to act on

17   grounds that apply generally to the class, so that final injunctive relief or

18   corresponding declaratory relief is appropriate respecting the class as a whole."

19   "Class certification under Rule 23(b)(2) is appropriate only where the primary relief

20   sought is declaratory or injunctive." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

21   986 (9th Cir. 2011) (quoting *Zinser*, 253 F.3d at 1195.) As the Supreme Court

22   explained in *Dukes*, class certification under Rule 23(b)(2) is not authorized when

23   each individual class member would be entitled to a different injunction or when each

24   class member would be entitled to an individualized award of monetary damages.

25   *Dukes*, 564 U.S. at 360–61.

26          The Court finds that Plaintiffs' claims cannot be certified under Rule 23(b)(2)

27   for at least two reasons. First, and most importantly, the Court has already found that

28   the named Plaintiffs lack Article III standing to seek prospective injunctive relief

because there is no genuine dispute of fact that they do not face a real and immediate threat of future harm. "A class of plaintiffs does not have standing to sue if the named plaintiff does not have standing." *B.C. v. Plulmas Unified School Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999); *see also Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) ("Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief."). Thus, without standing to seek injunctive relief, Plaintiffs cannot certify a class on the basis of such relief. *See Jones v. ConAgra Foods, Inc.*, No. C 12–01633 CRB, 2014 WL 2702726 (N.D. Cal. June 13, 2014) (denying class certification pursuant to Rule 23(b)(2) where named plaintiffs lacked standing to pursue injunctive relief).

Second, even if Plaintiffs had standing to seek injunctive relief, the *primary* relief sought by Plaintiffs is monetary, not injunctive. Although Plaintiffs at one point in their motion for class certification state that they seek to enjoin Defendants from engaging in the misrepresentations and omissions at issue, it is clear from the pleadings, as well as from the effort and expert fees expended on damages models, that the central focus of this suit is monetary relief. *See, e.g.*, *Ackerman v. Coca-Cola Co.*, No. 09 CV 395(DLI)(RML), 2013 WL 7044866, at *17 (S.D.N.Y. July 18, 2013) (concluding that monetary relief was central to plaintiffs' claims, or at least of equal importance, where the crux of the complaint was that plaintiffs overpaid for a product based on deceptive labeling). Thus, certification under Rule 23(b)(2) is improper. *Palmer v. Stassinos*, 233 F.R.D. 546, (N.D. Cal. 2006) ("Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery.") (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 165 (2d. Cir. 2001) abrogated on other grounds, *Dukes*, 564 U.S. 338 (2011)).

## D.    The Ascertainability Requirement

Apart from the express requirements of Rule 23, federal courts have

consistently held that the party seeking class certification must demonstrate that an identifiable and ascertainable class exists. *See Bee, Denning, Inc. v. Capital Alliance Group*, 310 F.R.D. 614, 622 (S.D. Cal. 2015); *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 535 (N.D. Cal. 2012). "A class is ascertainable if it is defined by objective criteria and if it is administratively feasible to determine whether a particular individual is a member of the class." *Bruton v. Gerber Prod. Co.*, No. 12–CV–02412–LHK, 2014 WL 2860995, at \*4 (N.D. Cal. June 23, 2014). However, a class is not ascertainable where a court must investigate the merits of individual claims to determine class membership, or if membership depends upon subjective factors such as a prospective member's state of mind. *See Hanni v. Am. Airlines, Inc.*, No. C 08–00732 CW, 2010 WL 289297, at \*9 (N.D. Cal. Jan. 15, 2010).

Plaintiffs' proposed classes do not meet the ascertainability standard. First, the classes are not defined by objective criteria. Rather, the classes are defined as consumers who were exposed to a statement or instruction regarding safe and effective continuous use, or who were not told there was a material risk of bodily injury if the PC 500 was used continuously. This is inherently subjective criteria that depends upon putative class members' interaction with their physicians; whether the class members can remember whether or not they were exposed to a statement or instruction regarding continuous use; and whether class members' physicians warned them of the risks or not. Indeed, the testimony of some of the named Plaintiffs reveals how fraught this membership criteria is—Plaintiff Albaba, for example, could not recall what instructions he received or reviewed, or whether his physician warned him of any risks. *See, e.g.*, *Carrera v. Bayer Corp.*, 727 F.3d 300, 309 (3d. Cir. 2013) (concluding that affidavits could not be used to ascertain a class where the named plaintiff's deposition testimony suggested that individuals would have difficulty accurately recalling details needed to identify themselves as members of the class). Moreover, as Defendants' expert Dr. Christine Wood convincingly attests, even where patients receive risk information and disclosure of potential side effects, their

1   depth of processing that information varies considerably due to a cognitive bias
2   known as selective perception. (Wood Decl. ¶¶ 31–33.) The implication is that
3   putative class members may have received information regarding the risks associated
4   with continuous use of the PC 500, but nonetheless discounted the information to
5   such a degree that they do not recall receiving it in the first place. A class definition
6   that ultimately depends upon the vagaries of human memory and the biases
7   associated with processing information does not provide the objective criteria needed
8   to adequately identify a class. *See, e.g.*, *In re Phenylpropanolamine (PPA) Prods.*
9   *Liab. Litig.*, 214 F.R.D. 614, 618–19 (W.D. Wash. 2003) (finding proposed class was
10  not ascertainable in part because the details needed to establish class membership
11  "would sorely tax putative class members' memories").

12          Second, and relatedly, the class definition does not provide an administratively
13  feasible way to determine whether a particular person is a class member. Even
14  assuming that medical and billing records dating back to 1992 are available and
15  detailed enough to establish who purchased or rented a PC 500, these records would
16  not establish who was exposed to the misrepresentations, or who was not told about
17  the risks, prior to purchasing or renting the device. Plaintiffs propose no means of
18  making such an identification, apparently relying on a presumption of reliance that
19  the Court finds inapplicable in this case. Thus, the only way that class members could
20  identify themselves to the Court would be based on their memory of the
21  circumstances surrounding their use of the product. Issues of reliability aside,
22  inquiries into putative class members' memories of the circumstances surrounding
23  their use of the product would require the type of individualized fact-finding and
24  "mini-trials" that defeat ascertainability. *See Hernandez v. County of Monterey*, 305
25  F.R.D. 132, 149 (N.D. Cal. 2015) ("If class members are impossible to identify
26  without extensive and individualized fact-finding or 'mini-trials,' then a class action
27  is inappropriate.") (citation omitted); W. Rubenstein, *Newberg on Class Actions* §
28  3.3 (5th ed. 2012) ("Administrative feasibility means that identifying class members

is a manageable process that does not require much, if any, individual factual inquiry.").

For these reasons, Plaintiffs' proposed classes are not ascertainable.

* * *

In sum, Plaintiffs fail to satisfy the requirements for class certification under both Rule 23(b)(3) and Rule 23(b)(2). Plaintiffs also fail to satisfy the requirement that a proposed class be ascertainable. Accordingly, the Court DENIES Plaintiffs' motion for class certification.

## IV.   CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment. (ECF No. 76.) Summary judgment is granted on (1) Plaintiffs' breach of warranty claims (Plaintiffs' Sixth and Seventh Cause of Action), (2) the issue of Plaintiffs' standing to seek injunctive relief, and (3) the issue of Plaintiff Lucas, Fisher, and Gamma's entitlement to restitution. Summary judgment is **DENIED** on (1) the question whether Plaintiffs' UCL, CLRA, FAL, and common law fraud claims are time-barred, and (2) whether Plaintiff Albaba is entitled to restitution.

Furthermore, the Court **DENIES** Plaintiffs' motion for class certification. (ECF No. 55.) Plaintiffs fail to satisfy the Rule 23(b)(3) predominance requirement, and the named plaintiffs lack standing to seek injunctive relief on behalf of the proposed classes under Rule 23(b)(2). The Plaintiffs' proposed class definitions also lack ascertainability.

Since the Court did not rely on the proffered declarations and testimony of Kenneth Diller, Dr. Daniel Lozano, Dr. Jon A. Krosnick, or Wesley Nutten, Defendants' motions to exclude these declarations and testimony are **TERMINATED AS MOOT**. (ECF Nos. 74, 75.) Plaintiffs' motion to file under seal exhibits in support of their opposition to Defendants' motion to exclude is also

1  **TERMINATED AS MOOT**. (ECF No. 88.)

2      **IT IS SO ORDERED.**

3

4  **DATED:  September 30, 2016**

5

6  Hon. Cynthia Bashant
   United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 32 –

15cv258